UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

THE NATIONAL RETIREMENT FUND and the :
BOARD OF TRUSTEES OF THE NATIONAL :
RETIREMENT FUND, :

                    Plaintiffs, :

        -vs- :

COLONY CAPITAL, LLC; COLONY :
INVESTORS VI, L.P.; COLONY INVESTORS :
VII, L.P.; COLONY RIH HOLDINGS LLC; RIH :
COINVESTMENT PARTNERS, L.P.; RIH :
VOTECO, LLC; RIH COINVESTMENT :
VOTECO, LLC; THOMAS J. BARRACK, JR.; :
and RIH RESORTS, LLC, :

                  Defendants. :

-------------------------------------------------------------x

Civ. No. <u>19 cv 3875</u>

**COMPLAINT**

       Plaintiffs, the National Retirement Fund (the "NRF") and the Board of Trustees of the

National Retirement Fund (the "Trustees") (together, the "Fund"), by their attorneys Schulte Roth & Zabel

LLP, as and for their complaint against Defendants, Colony Capital, LLC; Colony Investors VI, L.P.;

Colony Investors VII, L.P.; Colony RIH Holdings LLC; RIH Coinvestment Partners, L.P.; RIH Voteco,

LLC; RIH Coinvestment Voteco, LLC; RIH Resorts, LLC (such entities together, the "Colony Entities");

and Thomas J. Barrack, Jr. ("Barrack") respectfully allege as follows:

## NATURE OF ACTION

       1.    This is an action for (a) declaratory judgment by the NRF, a Taft-Hartley

multiemployer pension benefit fund, and its Trustees, fiduciaries of the NRF, on behalf of the

Legacy Plan of the NRF, against the Colony Entities and Barrack to establish that the Colony

Entities and Barrack are jointly and severally liable for the Atlantic Club Casino Hotel's (the

"Atlantic Club") withdrawal liability owed to the NRF pursuant to Sections 502(a)(3) and 4301(a) and (b) of the Employee Retirement Income Security Act of 1974, *as amended* ("ERISA"), 29 U.S.C. §§ 1132(a)(3) and 1451(a) and (b), as a result of the Atlantic Club's complete withdrawal from the Legacy Plan, and (b) am action by the Fund seeking the information and documents it requested in its request pursuant to Section 4219(a) of ERISA, 29 U.S.C. § 1399(a) that Defendants have not provided to it.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to Sections 502(a)(3), (e)(1) and (f) and 4301(a), (b) and (c) of ERISA, 29 U.S.C. §§ 1132(a)(3), (e)(1) and (f) and 1451(a), (b) and (c).

3.      Venue is properly laid in this Court pursuant to Section 502(e)(2) and 4301(d) of ERISA, 29 U.S.C. §§ 1132(e)(2) and 1451(d), because the Fund and the Legacy Plan are administered in part in New York County, New York.

## THE PARTIES AND RELEVANT NON-PARTIES

A.      **The Fund**

4.      The NRF is a Taft-Hartley trust fund with Trustees selected by the labor organization Workers United and employers that contribute to the NRF.  Prior to a spinoff of certain assets and liabilities of the multiemployer plans sponsored by the NRF, effective December 31, 2017, certain Trustees were selected by the labor organization UNITE HERE.  The NRF is established and maintained pursuant to Section 302(c)(5) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186(c)(5).

5.      The NRF is governed by an agreement and declaration of trust.

6.      The NRF is administered in White Plains, New York and Lincoln, Rhode Island. The Trustees generally hold their meetings in New York, New York.

2

7.     The NRF, through its Trustees, sponsors and administers the Legacy Plan.

8.     The Legacy Plan is a multiemployer pension plan within the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37).  Prior to January 1, 2015, the Legacy Plan was known as the Pension Plan of the National Retirement Fund.

9.     The Trustees are fiduciaries, within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), of the NRF and the Legacy Plan.

**B.     The Atlantic Club**

10.     At all relevant times, the Atlantic Club and the members of its controlled group were employers within the meaning of Sections 3(5), (11), (12) and 4001(b) of ERISA, 29 U.S.C. §§ 1002(5), (11), (12) and 1301(b), and Section 301(a) of the LMRA, 29 U.S.C. § 185(a).

11.     At all relevant times, RIH Acquisitions NJ, LLC ("RIHA"), a New Jersey limited liability company, was doing business as the Atlantic Club.  Management of RIHA was vested in a board comprised of Barrack and Nicholas I. Ribis ("Ribis").  The board had all authority, rights and powers in the management of RIHA's business to do any and all acts and things necessary, proper, appropriate, advisable, incidental or convenient to conduct the business an affairs of RIHA.  Upon information and belief, Barrack controlled RIHA.

12.     The Atlantic Club was a contributing employer to the Legacy Plan.

**C.     The Atlantic Club's Owners**

13.     Colony Capital, LLC ("Colony Capital") is a Delaware limited liability company, with its principal place of business in Santa Monica, California.

14.     Barrack is, and at all relevant times was, Colony Capital's Executive Chairman.

15.     Colony Capital is a private equity investment firm that is in the business of investing money for investors and participating in the management of such investments.

16.     RIH Resorts, LLC ("RIH Resorts"), a Delaware limited liability company, was formed in February 2005 by the general partner of Colony Investors VI, LP ("Colony VI").  RIH Resorts indirectly owned 100 percent of the Atlantic Club at the time of the Atlantic Club's withdrawal from the Legacy Plan on January 13, 2014.  Management of RIH Resorts was vested in a board comprised of Barrack and Ribis.  Barrack controlled RIH Resorts.

17.     Colony Capital manages Colony VI and Colony Investors VII, L.P. ("Colony VII"), private investment funds that are Delaware limited partnerships with principal places of business in Santa Monica, California.  Colony VI was formed in 2003.  Colony VII was formed in 2005. Barrack was, and is, the majority member of the general partners of Colony VI and Colony VII. The general partners of Colony VI and Colony VII have the full, exclusive and complete right, power, authority, discretion, obligation and responsibility vested in or assumed by a general partner of a limited partnership under Delaware law, including those necessary to make all decisions affecting the business of Colony VI and Colony VII and to take actions – including to construct, operate, develop, maintain, finance, refinance, improve, own, sell, convey, assign, mortgage, lease or foreclose upon any real estate or personal property – necessary, convenient or incidental to the accomplishment of the purposes of Colony VI and Colony VII.

18.     Colony RIH Holdings, LLC ("Colony Holdings"), a Delaware limited liability company, was formed in 2001.  Colony Holdings owned 61.27 percent of RIH Resorts.  Colony VI and Colony VII owned 43.14 percent and 56.85 percent, respectively, of Colony Holdings. Barrack controlled Colony Holdings as its Chief Executive Officer, President and the managing member of its general partner.

19.     RIH Coinvestment Partners, LLC ("RIHC") was formed in March 2005 and initially owned 38.73 percent of RIH Resorts.  Its general partner was RIH GenPar, LLC

("GenPar").  GenPar was owned and controlled by Barrack.  At the time of the Atlantic Club's withdrawal from the Legacy Plan, RIHC's interest in RIH Resorts had been diluted to 38.59 percent.  This occurred when Colony Capital later formed a co-investment fund ("RIHCII") that acquired a less than 1.5 percent equity-only interest in RIH Resorts.

20.      At all relevant times, governance and voting rights of RIH Resorts was vested exclusively in two "Votecos" – RIH Voteco, LLC ("RIH Voteco") for Colony VI and Colony VII and RIH Coinvestment Voteco, LLC ("RIHC Voteco") for RIHC.  Barrack was the sole owner, member and the manager of RIH Voteco.  Barrack and Ribis were the sole owners, members and managers of RIHC Voteco.  Barrack controlled RIH Voteco and RIHC Voteco.

21.      At all relevant times, the Colony Entities and Barrack were trades or businesses under common control with the Atlantic Club pursuant to Section 4001(b)(1) of ERISA, 29 U.S.C. § 1301(b)(1), Section 414(c) of the Code and the regulations promulgated thereunder.

### Factual Background

A.      **Defendants' Acquisition of the Atlantic Club**

22.      In September 2004, Colony Capital committed to purchase the Atlantic Club, and three other casino properties (the "Heat Portfolio").  Colony Capital named the acquisition "Project Heat."

23.      Upon information and belief, Barrack led Project Heat on behalf of Colony Capital and made all material decisions in connection with Project Heat on behalf the Colony Entities.

24.      Colony Capital intended to combine the Heat Portfolio with its other casino holdings to form a single entity, and to take that entity public through an initial public offering ("IPO") by the end of 2005.

25.      The Project Heat investment required an equity investment of $360 million.

26.     In or about September 2004, Colony VI committed to invest $92.6 million into Project Heat, which, upon information and belief, was the maximum Colony VI could contribute due to its internal investment diversification requirements.  Colony VI called the $92.6 million from investors in April 2005.

27.     To raise the remainder of the necessary equity, Colony Capital pitched Project Heat as an opportunity to invest alongside Colony Capital to prospective investors, touting the investments' value once the portfolio was rolled up with Colony Capital's other casino holdings and taken public.

28.     Upon information and belief, Colony Capital's goal was to raise the remainder of the amount required – approximately $267 million – from co-investors.  Co-investors, however, invested only $135 million through RIHC, leaving a $132 million shortfall.

29.     Upon information and belief, Colony Capital considered the equity provided by RIHC to be "Colony Equity."

30.     Upon information and belief, RIHC did not invest in any other properties other than the Heat Portfolio.

31.     By July 2005, Colony VII committed to purchase approximately 35 percent of the Heat Portfolio.

32.     In September 2005, Colony VII consummated its investment in the Heat Portfolio, investing $127 million, which was the balance of the equity then required to acquire the Heat Portfolio.  The purchase of the Heat Portfolio closed shortly thereafter.

B.     **Ownership and Control of the Atlantic Club**

33.     At and prior to the time of the Atlantic Club's withdrawal from the Legacy Plan, Colony VI, Colony VII (through Colony Holdings) and RIHC (and RIHCII) owned 100 percent of RIH Resorts, which indirectly owned 100 percent of the Atlantic Club.

34.     At and prior to the time of the Atlantic Club's withdrawal from the Legacy Plan, Colony VI indirectly owned 26.43 percent, Colony VII indirectly owned 38.84 percent, and RIHC (and RIHCII) indirectly owned 38.73 percent of the Atlantic Club.

35.     At all relevant times, the general partners of Colony VI and Colony VII had full, exclusive and complete right, power and discretion to operate, manage and control the affairs of Colony VI and Colony VII.  Barrack was the majority member of the general partners of Colony VI and Colony VII and, as such, controlled both entities.

36.     At all relevant times, GenPar had full, exclusive and complete right, power and discretion to operate, manage and control the affairs of RIHC.  The limited partners of RIHC were expressly prohibited from taking part in the management or control of the business of RIHC. RIHC's investment decisions were left to its general partner, GenPar.

37.     At all relevant times, Barrack was the sole managing member and sole owner of GenPar.  As managing member, Barrack had the complete and exclusive right to manage, control, conduct the business and affairs of, and act for and on behalf of GenPar.

38.     Colony VI, Colony VII and RIHC (together, the "Colony Funds") acquired "Class B Units" in RIH Resorts and therefore had no voting power or other power to control the affairs or operations of RIH Resorts.

39.     Operational control of RIH Resorts was vested 100 percent in RIH Voteco and RIHC Voteco, which owned small percentages of RIH Resorts though "Class A Units."  The Class A Units had 100 percent of the voting rights of RIH Resorts.

40.     At all relevant times, Barrack owned and controlled 100 percent of RIH Voteco. Barrack and Ribis owned 60 percent and 40 percent of RIHC Voteco, respectively.  Barrack controlled RIHC Voteco.  In the aggregate, Barrack owned approximately 83 percent of the voting units of RIH Resorts – 61 percent through RIH Voteco and 22 percent through the RIHC Voteco (60 percent of its approximately 38 percent ownership).

C.     **The Atlantic Club's Withdrawal from the Legacy Plan**

41.     Prior to January 2014, the Atlantic Club was a contributing employer to the Legacy Plan, then called the Pension Plan of the National Retirement Fund.

42.     On November 6 and 7, 2013, RIH Acquisitions NJ, LLC and RIH Propco, LLC (together, the "Atlantic Club Debtors") filed voluntary Chapter 11 petitions in the United States Bankruptcy Court for the District of New Jersey.

43.     On behalf of the board of RIH Acquisitions NJ, LLC, of which Barrack was then the sole member, Barrack signed the resolutions which, *inter alia*, authorized the bankruptcy filings.

44.     On January 13, 2014, the Atlantic Club Debtors ceased operations, thereby completely withdrawing from the Legacy Plan and incurring withdrawal liability in the estimated amount of $66,813,958.00, payable in 80 quarterly installments of $929,154.37 each.

45.     By letter dated January 17, 2014, the Fund requested information from the Atlantic Club Debtors pursuant to Section 4219(a) of ERISA, 29 U.S.C. § 1399(a), concerning, *inter alia*,

the Atlantic Club's ownership structure, contribution history and financial condition (the "4219(a) Request").

46.     The Atlantic Club Debtors, the Colony Entities and Barrack did not provide the Fund with the requested information or otherwise respond within thirty (30) days, as required by Section 4219(a) of ERISA, 29 U.S.C. § 1399(a).  The Colony Entities did not produce any documents to the Fund until July of 2015, and their document production was not complete.

47.     On March 11, 2014, the Fund timely filed proofs of claim for withdrawal liability in the Atlantic Club Debtors' bankruptcy case against the Atlantic Club Debtors.  In these proofs of claim, the Fund reserved its right to file an amended proof of claim when the Atlantic Club's withdrawal liability became finalized.  These proofs of claim constituted a notice and demand of withdrawal liability to the Atlantic Club and its controlled group pursuant to Section 4219(b)(1) of ERISA.

48.     On November 13, 2015, the Fund filed amended proofs of claim in the Atlantic Club Debtors' bankruptcy case against the Atlantic Club Debtors.  The proofs of claim set forth claims for withdrawal liability in the gross amount of $66,813,958.00 and in the net amount of $56,952,699.62 (taking into account a reduction in the amount of $9,861,258.38 due to the 80 payment cap set forth in Section 4219(c)(1)(B) of ERISA, 29 U.S.C. § 1399(c)(1)(B)), and included a payment schedule that required quarterly payments in the amount of $929,154.37 commencing on March 1, 2015.

49.     Plaintiffs do not assert any claims against the Atlantic Club Debtors in this action.

50.     At the time of the Atlantic Club's withdrawal from the Legacy Plan, RIH Resorts was the 100 percent indirect owner of the Atlantic Club.

D. **Defendants are Jointly and Severally Liable for the Atlantic Club's Withdrawal Liability.**

51.     Because Defendants were trades or businesses under common control pursuant to Section 4001(b)(1) of ERISA, 29 U.S.C. § 1301(b)(1), at the time the Atlantic Club incurred a complete withdrawal from the Legacy Plan, each is jointly and severally liable for the full amount of the Atlantic Club's withdrawal liability incurred as a result of the Atlantic Club's withdrawal.

(1)     **Defendants are Trades or Businesses.**

52.     Colony Capital is a "trade or business" within the meaning of Section 4001(b)(1) of ERISA, 29 U.S.C. § 1301(b)(1), because it is in the business of buying and selling investments in real estate.

53.     Colony Capital was formed in 1991.  As of 2005 Colony Capital claimed that it had invested $13.9. billion in 116 transactions comprising 7,566 different assets, and that it had invested $4.25 billion of equity.  Colony further claimed that it had invested and expended more than $200 million of its own capital in building its global business as a business.

54.     The Colony Entities and Barrack are trades or businesses, because, upon information and belief, Barrack and the Colony Entities, all of which Barrack controlled, engaged in a particular type of investment approach that was more than mere passive stock holding.

55.     The Colony Entities and Barrack have engaged with continuity and regularity in investment management activity, the primary purpose of which has been income or profit.

56.     Upon information and belief, the Colony Entities charge management and incentive fees to their investors.

57.     Upon information and belief, the Colony Entities and Barrack participated in the management of the Atlantic Club's business and operations.

58.     Upon information and belief, the Colony Entities acquired the Heat Portfolio to implement restructuring and operational plans, including combining the Heat Portfolio with other Colony Capital casino holdings, overseeing and managing the portfolio companies' operations, taking the combined entity public through an IPO, and otherwise attempting to create growth in the value of the Heat Portfolio.

59.     New Jersey law requires executives involved in the operation of casinos in a supervisory capacity or empowered to make discretionary decisions on casino operations to obtain Casino Key Employee Licenses.  Upon information and belief, Barrack, at all relevant times, held a Casino Key Employee License from the New Jersey Casino Control Commission.

60.     Marketing materials regarding Project Heat prepared by Colony and delivered to prospective investors included plans for the Heat Portfolio that surpass mere passive stockholding, including introducing entrepreneurial management, improving the quality of the gaming environment through a capital expenditure program, upgrading the casino product, realigning customer focus and exploiting local marketing opportunities.

61.     Upon information and belief, a Colony Capital management team led and implemented the transition, property improvement and operating plans for the Atlantic Club.

62.     Section 3.0l(A) of the Colony VI Partnership Agreement describes "[t]he primary purpose of Colony VI," in relevant part, as "(i) the acquisition, *management* and sale of primarily real estate-related Investments located primarily in Europe, Asia and North America . . . and (ii) the acquisition, *improvement*, holding, *maintenance*, *management, operation*, leasing, financing, foreclosing upon, restructuring, selling, disposing of and otherwise exercising rights, remedies and claims with respect to the assets underlying any such Investment" (emphasis added).

63.     Section 3.02(A) of the Colony VI Partnership Agreement authorizes Colony VI "to acquire, invest in, lease, hold, mortgage, pledge, *manage*, *operate* or otherwise deal in or with the Investments and any real or personal property which may be necessary, convenient or incidental to the accomplishment of the purposes of Colony VI . . ." (emphasis added).

64.     Section 3.02(8) of the Colony VI Partnership Agreement authorizes Colony VI "to *construct*, *operate*, *develop*, *maintain*, finance, refinance, *improve*, own, sell, convey, assign, mortgage, lease or foreclose upon any real estate and any personal property necessary, convenient or incidental to the accomplishment of the purposes of Colony VI . . ." (emphasis added).

65.     Section 6.07(8) of the Colony VI Partnership Agreement provides that the "General Partner" shall be paid an annual investment management fee.

66.     Section 3.0l(A) of the Colony VII Partnership Agreement describes "[t]he primary purpose of Colony VII," in relevant part, as "(i) the acquisition, *management* and sale of primarily real estate-related investments located primarily in Europe, Asia and North America . . . and (ii) the acquisition, *improvement*, holding, *maintenance*, *management, operation*, leasing, financing, foreclosing upon, restructuring, selling, disposing of and otherwise exercising rights, remedies and claims with respect to the assets underlying any such Investment" (emphasis added).

67.     Section 3.02(A) of the Colony VII Partnership Agreement authorizes Colony VII "to acquire, invest in, lease, hold, mortgage, pledge, *manage*, *operate* or otherwise deal in or with the Investments and any real or personal property which may be necessary, convenient or incidental to the accomplishment of the purposes of Colony VII . . ." (emphasis added).

68.     Section 3.02(B) of the Colony VII Partnership Agreement authorizes Colony VII "to *construct*, *operate*, *develop*, *maintain*, finance, refinance, *improve*, own, sell, convey, assign,

mortgage, lease or foreclose upon any real estate and any personal property necessary, convenient or incidental to the accomplishment of the purposes of Colony VII . . ." (emphasis added).

69.     Colony VII's Private Placement Memorandum ("PPM") sets forth its investment strategy as "creating capital appreciation opportunities through repositioning, *restructuring*, *development*, and *intensive management*" (emphasis added).

70.     The Colony VII PPM provides: "By mining opportunities that fall between the investment purview of traditional real estate and private equity funds, Colony is able to unlock value through *active asset management* of these real estate investments . . . .   In general, real estate-dependent corporate investments are pursued in conjunction with *company management*, while certain operating company investments may be pursued in joint ventures with corporate investors" (emphasis added).

71.     Section 3.02(A) of the RIHC Partnership Agreement provides that RIHC "is empowered and authorized . . . to manage, dispose of or otherwise deal in or with and take all and any actions which may be necessary, convenient or incidental to the accomplishment of the purposes of the Partnership."

72.     The RIHC PPM provides that "Prospective non-U.S. investors should be aware that Partnership income and gain (as well as gain from the sale or other disposition of an interest in the Partnership) generally will be treated as effectively connected with the conduct of a U.S. trade or business in respect of U.S. investments in real estate-related businesses owned through partnerships or limited liability companies.

(2)    **The Defendants are in the Atlantic Club's Controlled Group.**

(a)    **The Colony Funds are in the Atlantic Club's Controlled Group.**

73.    The ownership, profits and/or capital interests of multiple entities owning less than 80 percent of such interests in a partnership or corporation are aggregated to determine controlled group members when the owners have formed a partnership or joint venture.

74.    The Colony Funds, indirectly owned, in the aggregate, at least 80 percent of the total value of shares of all classes of stock of the Atlantic Club.  RIH Resorts had two classes of stock units, Class A and Class B.  The holders of Class B Units owned 99 percent of RIH Resorts. In the aggregate, the Colony Funds (and RIHCII) owned 100 percent of the Class B Units of RIH Resorts.

75.    The Colony Funds indirectly owned, in the aggregate, at least 80 percent of the capital interests and/or profit interests of the Atlantic Club.  Upon information and belief, at least 80 percent of the profits made with respect to the Atlantic Club were due to the limited partners of the Colony Funds (and RIHCII).  Upon information and belief, 100 percent of the profits made with respect to the Atlantic Club were due to the general partner and the limited partners of the Colony Funds (and RIHCII).  Upon information and belief, the limited partners of the Colony Funds committed more than 99 percent of the capital committed to the funds, respectively.

76.    The investors in the Atlantic Club were brought together as a result of top-down decision-making by Barrack, rather than being brought together by happenstance or coincidence, and they engaged in joint activity.

77.    The Colony Funds formed a partnership or joint venture for the purposes of investing in the Heat Portfolio through RIH Resorts.

78. The Colony Funds' investments in the Heat Portfolio, including the Atlantic Club, were the result of top-down decision making by Barrack.

79. The Colony Funds' investments in the Heat Portfolio, including the Atlantic Club, were the result of concerted, not independent, decision-making.

80. The sequence of events in connection with Colony Capital's acquisition of the Heat Portfolio – Colony Capital's purchase commitment, Colony VI's investment, Colony Capital's fundraising efforts from co-investors, RIHC's investment, and finally Colony VII's bridge-gapping investment – were all orchestrated and coordinated by Barrack through entities he controlled.

81. RIHC was formed to provide the necessary capital to complete the acquisition of the Heat Portfolio by Colony Capital – an acquisition that Colony Capital committed to complete prior to the creation of RIHC. Upon information and belief, RIHC made no investments following its investment in Project Heat.

82. After Colony Capital's acquisition of the Heat Portfolio, management of the investment was coordinated and controlled by Barrack.

    **(b)**     **Barrack, RIH Voteco and RIHC Voteco are in the Atlantic Club's Controlled Group.**

            **(i)**     **Voting Control**

83. Barrack, through RIH Voteco and RIHC Voteco, owned at least 80 percent of the total combined voting power of units in RIH Resorts entitled to vote.

84. In the aggregate, Barrack owned 83 percent of the voting units of RIH Resorts – 61 percent through RIH Voteco and 22 percent through the RIHC Voteco (60 percent of its approximately 38 percent ownership).

85.     None of the equity owners of the Atlantic Club – the Colony Funds (and RIHCII) – had the power or right to control the operations of RIH Resorts or voting power.

86.     Exclusive operational control of RIH Resorts was vested in RIH Voteco and RIHC Voteco.

87.     Barrack owned and controlled 100 percent of RIH Voteco.

88.     Barrack and Ribis owned 100 percent of RIHC Voteco, with Barrack owning 60 percent of the voting units.  Barrack controlled 100 percent of RIHC Voteco.

89.     Because Barrack controlled RIH Resorts through RIH Voteco and RIHC Voteco, Barrack, RIH Voteco and RIHC Voteco are in common control with the Atlantic Club.

**Profits and Capital Interests**

90.     RIH Voteco and RIHC Voteco were formed at Barrack's direction by entities he controlled to segregate operational control of the Atlantic Club from economic ownership of the Atlantic Club to ensure that Colony Capital could achieve his goal to own and to operate the Atlantic Club.

91.     For purposes of determining the members of the Atlantic Club's controlled group members, this segregated structure should be ignored, and the interests of the fractionalized entities that indirectly owned the Atlantic Club through RIH Resorts should be aggregated.

92.     The interests in RIH Resorts owned by RIH Voteco and RIHC Voteco are aggregated with the interests of the Colony Funds because these entities formed a partnership or joint venture.  After being aggregated, RIH Voteco and RIHC Voteco own at least 80 percent of the capital interests and/or profits interests in the Atlantic Club.

E.       **The Standstill Agreement**

93.      On May 7, 2014 the Fund and the Colony Entities entered into a standstill agreement (the "Standstill Agreement") which, *inter alia*, prohibited the parties from serving, filing, or otherwise commencing any lawsuit or arbitration proceeding with respect to the Atlantic Club's withdrawal liability while the Standstill Agreement was in effect, and tolled statutes of limitations.

94.      On December 11, 2018 the Fund and the Colony Entities entered into an amended Standstill Agreement (the "First Amended Standstill Agreement"), which, by its terms, terminated at the end of April 30, 2019.  The First Amended Standstill Agreement terminated on April 30, 2019.

95.      The Colony Entities agreed in the Standstill Agreement "to provide non-privileged documents to the Fund concerning the ownership structure of the Atlantic Club and any other information that is reasonably necessary for the Fund to determine whether any entities in the Atlantic Club's ownership chain . . . are members of the Atlantic Club's controlled group."

96.      The parties to the Standstill Agreement agreed to meet and confer in good faith regarding the Colony Entities' document production and any other documents sought by the NRF regarding the Atlantic Club's controlled group.

97.      The Colony Entities refused to produce any documents to the NRF unless the NRF agreed to the terms of a confidentiality agreement.  The Colony Entities and the NRF entered into a confidentiality agreement on April 7, 2015 (the "Confidentiality Agreement").

98.      The Colony Entities produced to the NRF certain documents (some of which were redacted).  The Colony Entities did not produce all of documents the NRF requested.  For example, upon information and belief, the Colony Entities did not produce all communications among

entities and individuals (i) regarding the reasons RIHC was formed and the reasons for the ownership structure of RIHC and (ii) regarding the process and the sequence of events regarding, and the people involved in, the decisions by the Colony Funds and RIHCII to invest in the Atlantic Club.

99.     Pursuant to the First Amended Standstill Agreement, the Fund maintains, and the Colony Entities dispute, that the proofs of claim filed by the Fund in the Atlantic Club Debtor's bankruptcy case constitute a withdrawal liability demand under ERISA Section 4219(b)(1), 29 U.S.C. § 1399(b)(1).   In addition, the First Amended Standstill Agreement memorializes the Colony Entities' right to contest the proofs of claim filed in the Atlantic Club Debtors' bankruptcy case constituted a withdrawal liability demand under the law.

100.     Counsel to the Colony Entities has, by written communication to the Fund's counsel, asserted that the Colony Entities are not a trade or businesses under common control with the Atlantic Club pursuant to Section 4001(b)(1) of ERISA, 29 U.S.C. § 1301(b)(1), and that the Colony Entities are not jointly and severally liable for the withdrawal liability incurred as a result of the Atlantic Club's withdrawal from the Legacy Plan.

## AS AND FOR THE FIRST CLAIM AGAINST DEFENDANTS
### (For Declaratory Judgment)

101.     The Fund repeats and realleges each and every allegation contained in Paragraphs 1 through 100 of this Complaint with the same force and effect as if set forth at length here.

102.     The Atlantic Club incurred a complete withdrawal from the Legacy Plan pursuant to Section 4203(a)(2) of ERISA, 29 U.S.C. § 1383(a)(2), on January 13, 2014 when the Atlantic Club permanently ceased all covered operations as a result of its November 2013 bankruptcy filing.

103.     On March 11, 2014 and November 13, 2015 the Fund timely filed proofs of claim for withdrawal liability in the Atlantic Club Debtor's bankruptcy case, constituting notice and

demand of withdrawal liability to the Atlantic Club and its controlled group pursuant to Section 4219(b)(1) of ERISA, 29 U.S.C. § 1399(b)(1), and setting forth a payment schedule pursuant to Section 4219(c)(2) of ERISA, 29 U.S.C. § 1399(c)(2).

104.    As of May 1, 2019, $15,795,624.29 in withdrawal liability payments has become due and is unpaid.  As of May 1, 2019, the present value of payments of withdrawal liability that will become due is $46,858,039.90.  The total present value of missed and future payments of withdrawal liability is $62,653,664.19, as of May 1, 2019.

105.    Barrack and the Colony Entities are "trades or businesses" under "common control" pursuant to Section 4001(b)(1) of ERISA, 29 U.S.C. § 1301(b)(1) with the Atlantic Club.

106.    Pursuant to Sections 502(g) and 4001(b)(1) of ERISA, 29 U.S.C. §§ 1132(g) and 1301(b)(1), as "trades or businesses" under "common control," the Colony Entities are treated as a single employer for all purposes under Title IV of ERISA, including withdrawal liability.

107.    Barrack and the Colony Entities are jointly and severally liable for the full amount of withdrawal liability incurred as a result of the Atlantic Club's complete withdrawal from the Legacy Plan pursuant to Section 4001(b)(1) of ERISA, 29 U.S.C. § 1301(b)(1), Section 414(c) the Code, because they are under common control with the Atlantic Club.

108.    Barrack and the Colony Entities deny that (i) the Fund's timely filed proofs of claim for withdrawal liability in the Atlantic Club Debtor's bankruptcy case constituted notice and demand of withdrawal liability to the Atlantic Club and its controlled group pursuant to Section 4219(b)(1) of ERISA, 29 U.S.C. § 1399(b)(1); (ii) they are trades or businesses under common control with the Atlantic Club; (iii) they may be treated as a single employer for all purposes under Title IV of ERISA, including withdrawal liability; and (iv) they are jointly and severally liable for

the Atlantic Club's withdrawal liability incurred following the Atlantic Club's complete withdrawal from the Legacy Plan.

109.    The requested declaratory judgment declaring the rights and responsibilities of the parties will resolve the current, actual controversies and is an appropriate exercise of this Court's discretion under 28 U.S.C. § 2201.

## AS AND FOR THE SECOND CLAIM AGAINST DEFENDANTS
### (For Production of Documents)

110.    The Fund repeats and realleges each and every allegation contained in Paragraphs 1 through 109 of this Complaint with the same force and effect as if set forth at length here.

111.    The Fund requested information from the Atlantic Club Debtors to assess the Atlantic Club's withdrawal liability on January 17, 2014 pursuant to Section 4219(a) of ERISA, 29 U.S.C. § 1399(a).  Neither the Atlantic Club Debtors, the Colony Entities nor Barrack provided the Fund with all of its requested information or otherwise responded within thirty (30) days as required by Section 4219(a) of ERISA, 29 U.S.C. § 1399(a).

112.    The Colony Entities provided only some of the requested information, subject to the Confidentiality Agreement, beginning on July 23, 2015 – more than one year after the thirty (30) day period in which a response was required by Section 4219(a) of ERISA, 29 U.S.C. § 1399(a) – and additional documents on February 8, 2016, August 25, 2016 and January 15, 2019.

113.    Because the Fund is entitled to all of the information and documents it requested in its 4219(a) Request, Defendants must be compelled to produce all such information and documents to the Fund.

**WHEREFORE,** Plaintiffs, the NRF and the Trustees, respectfully request an order and judgment:

114.    Declaring that the Colony Entities and Barrack are "trades or businesses" under "common control" with the Atlantic Club within the meaning of Section 4001(b) of ERISA 29 U.S.C. § 1301(b).

115.    Declaring that the Colony Entities and Barrack may be treated as a single employer for all purposes under Title IV of ERISA, including withdrawal liability.

116.    Declaring that the Colony Entities and Barrack are jointly and severally liable for the Atlantic Club's withdrawal liability incurred following the Atlantic Club's complete withdrawal from the Legacy Plan.

117.    Compelling the Defendants to produce all information and documents requested in the Fund's January 17, 2014 request pursuant to Section 4219(a), 29 U.S.C. § 1399(a).

118.    Granting such other legal and equitable relief as the Court deems appropriate.

Dated: May 1, 2019

SCHULTE ROTH & ZABEL LLP

By:    /s/ Ronald E. Richman
       Ronald E. Richman
       Holly H. Weiss

       919 Third Avenue
       New York, New York  10022
       (212) 756-2048 (telephone)
       (212) 593-5955 (facsimile)
       Ronald.Richman@srz.com
       Holly.Weiss@srz.com

       *Attorneys for Plaintiffs*